KYOEI KAIUN KAISHA, LTD.,
et al., Plaintiffs,

v.

M/V BERING TRADER, its engines,
tackle, gear, equipment, and appurte-
nances, in rem, et al., Defendants.

No. C90–613R.

United States District Court,
W.D. Washington,
at Seattle.

Sept. 26, 1991.

See also 795 F.Supp. 1046.

Robert J. Bocko, Bliss Riordan, Seattle, Wash., Herbert H. Ray, Jr., Bliss Riordan, Anchorage, Alaska, for plaintiffs.

Susan L. Barnes, Office of the U.S. Atty., Seattle, Wash., Philip A. Berns, Warren A. Schneider, U.S. Dept. of Justice, Trial Atty., Torts Branch, San Francisco, Cal., for the U.S.

Stephen Christopher Smith, Lane, Powell, Spears, Lubersky, Jerome Shulkin, Shulkin, Hutton & Bucknell, Seattle, Wash., for Bering Trader and M/V Bering Trader.

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ROTHSTEIN, Chief Judge.

THIS MATTER comes before the court on plaintiff United States' motion for summary judgment. Having reviewed the motion together with all documents filed in support and in opposition, and being fully advised, the court finds and rules as follows:

## I. BACKGROUND

The defendant vessel, the M/V AOYAGI MARU, was moored to the M/V BERING TRADER while it was anchored in Lost Harbor, Alaska. An approaching storm and the dragging of the M/V BERING TRADER's anchor required the separation of the vessels. During separation, a mooring line became tangled around the propeller of the M/V AOYAGI MARU, and the ship grounded on the rocky shore.

Plaintiff United States moves for summary judgment on defendants' liability under the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1321(f), for the cost of the Coast Guard's activities in preventing a threatened oil spill from defendants' grounded vessel.[1]

## II. DISCUSSION

### A. Standard of Review.

On a motion for summary judgment, this court will look at the evidence in the light most favorable to the non-moving party, and determine whether there are any genuine issues of material fact which would require a jury or judge to resolve the parties' differing versions of the truth at trial. *Sierra Club v. Penfold*, 857 F.2d 1307, 1320 (9th Cir.1988). If after a review of the evidence the court determines that there are no genuine issues of material fact, the moving party is entitled to summary judgment as a matter of law. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–631 (9th Cir.1987).

If the nonmoving party will bear the burden of proof at trial on an essential element of its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact as to that element, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Moreover, if the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### B. The Federal Water Pollution Control Act.

The Federal Water Pollution Control Act (FWPCA) imposes liability on the owner or operator of a vessel for the "actual costs" of abating the threat of an oil discharge, "except where an owner or operator can prove that a discharge was caused *solely* by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or

---

1. This Court's Order of March 5, 1991, granting defendant's motion to dismiss common law claims, 760 F.Supp. 174, held that the United States' sole remedy arises under the FWPCA.

omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses[.]" 33 U.S.C. § 1321(f)(1) (emphasis added). Defendants allege that they are not liable because the acts of a third party, those aboard the BERING TRADER, were solely responsible for the grounding.[2]

These exceptions to liability, however, must be narrowly construed. The clear intent of Congress was to impose liability on the polluting vessel except in very rare circumstances. *United States v. West of England Ship Owner's Mut. Protection & Indem. Ass'n*, 872 F.2d 1192, 1200 (5th Cir.1989) (Congress endorsed an absolute liability system with very limited exceptions). Congress intended its strict liability system to make owners or operators liable if their actions contributed in any way to an accident, without regard to whether or not their actions were negligent. *Id.* at 1196–1199. Only in situations where the accident was completely beyond the control of the polluting vessel would they be excused from liability. *Reliance Ins. Co. v. United States*, 677 F.2d 844, 849, 230 Ct.Cl. 390 (1982) (any conduct, however slight, on the part of an owner or operator contributing to a spill negates relief, even though such conduct might have operated in concert with greater third-party conduct to produce the spill). Thus, regardless of whether actions aboard of the BERING TRADER contributed to the grounding, if the AOYAGI MARU is in any way responsible defendants are liable for clean-up costs.

### C. AOYAGI MARU's Contribution to the Grounding.

The United States alleges that lack of communication aboard the AOYAGI MARU during unmooring contributed to the ship's grounding. The government contends that there was no communication between the stern of the AOYAGI MARU, where lines mooring the two ships together were secured, and the bridge, where the captain gave orders to the deck crew over loudspeakers during unmooring. The United States concludes that this lack of communication caused the captain of the AOYAGI MARU to engage her engines without knowing whether the mooring lines were clear of the ship, which led to the ship's propeller becoming entangled in a mooring line that was still in the water.

█ Exhaustive depositions of the AOYAGI MARU's captain and crew have been taken. Their uncontroverted statements describing events aboard the vessel support the government's argument. During unmooring the second officer is typically at the stern, with the chief officer at the bow, and they report to the captain when all lines are clear. Deposition of John Schibel, April 10, 1991, at 62. Both the AOYAGI MARU's second officer and chief officer, however, went to the bow during the unmooring. Deposition of Tadatsugu Miura, April 26, 1991, at 54 ("Miura Deposition"). The Captain of the AOYAGI MARU, Captain Takao, explained that he sent his second officer to the bow because he was not in communication with the bow. Interpreted Deposition of Shigeu Takao, March 11, 1991, at 90, 95 ("Takao Deposition").

It is uncontroverted that Crew-member Ogura had been ordered to the stern of the AOYAGI MARU for the emergency unmooring. Deposition of Toshiharu Ogura, June 20, 1991, at 21–22 ("Ogura Deposi-

---

**2.** Defendants make a half-hearted attempt to show that "an act of God" was the sole cause of the grounding. In support of their defense, defendants cite a remark by the captain of the Bering Trader, "I believe the wind in excess of 100 knots (reported at Dutch Harbor) should be considered the cause of the accident." Deposition of Irley Brown, January 30, 1991, at 200. Defendants, however, fail to put forth any evidence that the weather on the night of the grounding could not have been foreseen or guarded against, as required by this defense.

*See, Sabine Towing & Trans. Co. v. United States*, 666 F.2d 561, 564–565 (Ct.Cl.1981). Indeed, the Coast Guard's navigation guide for Alaska in effect at the time of the grounding warned that the "weather of the Aleutians is characterized by persistently overcast skies, strong winds, and violent storms ... winds are variable, local, and often strong ... a maximum wind of 104 knots has occurred at Adak." National Oceanic and Atmospheric Administration, United States Coast Pilot, v. 9, 198 (13th ed. 1987).

tion"). He and another crew member, Hiroshi Hiyama, were the only crew at the vessel's stern when they saw the BERING TRADER crew release three other lines prior to the AOYAGI MARU's signal to do so. *Id.* at 41–42. Just after these lines were released, and as they still lay in the water, Mr. Ogura heard and felt the AOYAGI MARU's engines start. *Id.* at 47–48. One of the lines then became fouled in the vessel's propeller. *Id.* at 45–47; Deposition of Hiroshi Hiyama, June 19, 1991, at 65–66. Captain Takao had neither heard from his second officer, nor any crew at the stern, before giving the order to engage the engines and back up the ship. Takao Deposition, at 101–102, 122.

Both parties agree that the AOYAGI MARU had no power due to the entangled propeller. Takao Deposition, at 117–118. The AOYAGI MARU dropped her anchors after the propeller was fouled, but they did not hold the ship and the AOYAGI MARU ran aground. Miura Deposition at 56.

### III. CONCLUSION

Defendants do not contest these facts, nor have they set forth any evidence explaining how the premature engagement of the AOYAGI MARU's engines did not contribute to the grounding. This court finds, therefore, that the start of the AOYAGI MARU's engines before any signals from her crew that the mooring lines were clear was a partial cause of the grounding. As there are no genuine issues of material fact, summary judgment is appropriate.

The United States requests an award of the amount of $508,504.74, with costs and interest. The government's request is, however, limited by a cap of $150 per gross ton of the defendants' vessel under 33 U.S.C. § 1321(f). In this court's Order Granting Defendants' Motion for Partial Summary Judgment of August 29, 1991, defendants' liability under the statute was determined to be based on a tonnage measurement of 2,036 tons, which therefore limits the government's potential recovery to $305,400.

Although Section 1321(f) of the FWPCA makes no specific provision for the award of interest, courts have awarded interest when the actual clean-up costs plus interest were less than the statutory cap. *United States v. Hollywood Marine, Inc.,* 519 F.Supp. 688, 692 (S.D.Tex.1981); *United States v. Malitovsky Cooperage Co.,* 472 F.Supp. 454, 458 (W.D.Penn.1979) (interest on money advanced by the government for clean-up constitute part of the "actual costs" within the meaning of the statute). Section 1321(f) unambiguously states, however, that the government's recovery shall be "in an amount not to exceed ... $150 per gross ton[.]" In the case where the actual cost of clean-up exceeds the statutory cap, interest may not be awarded on top of the statutory limit.

It is hereby ORDERED, ADJUDGED, and DECREED that:

1) plaintiff United States' motion for summary judgment is GRANTED;

2) plaintiff is awarded $305,400.00; and,

3) plaintiff's request for interest is DENIED.